359 So.2d 572 (1978)
INSURANCE MANAGEMENT CORPORATION, Appellant,
v.
CABLE SERVICES OF FLORIDA, INC., ITT Industrial Credit Co., and United States Fidelity & Guaranty Company, Appellees.
No. 77-1657.
District Court of Appeal of Florida, Second District.
June 9, 1978.
*573 James H. Seals of Moorey, Seals & Garvin, Fort Myers, for appellant.
Howard S. Rhoads of Allen, Knudsen, Swartz, DeBoest, Rhoads & Edwards, P.A., Fort Myers, for appellee ITT Industrial Credit Co.
J. Jeffrey Rice of Goldberg, Rubinstein & Buckley, P.A., Fort Myers, for intervenor/appellee/cross-appellant Flagship Bank of Fort Myers.
*574 GRIMES, Judge.
The primary question in this appeal is whether proceeds payable under an insurance policy for the loss due to theft of collateral which is the subject of a security agreement covering proceeds of the collateral are "proceeds" within the meaning of Section 679.306(1), Florida Statutes (1975).
Cable Services of Florida, Inc. (Cable) purchased a tractor with a backhoe attachment (tractor) and financed the purchase of it through a security agreement with ITT Industrial Credit Co. (ITT). By the terms of the security agreement with ITT, Cable was required to obtain insurance on the tractor. Cable later requested the applicable insurance from Insurance Management Corporation (IMC), which handled most of Cable's insurance accounts. Pursuant to IMC's request an appropriate rider was issued by United States Fidelity & Guaranty Co. (USF&G) to an existing policy which named ITT as an additional loss payee.
In the meantime, Cable borrowed some money from Flagship Bank of Fort Myers (Flagship) and as part of the collateral for the loan gave Flagship a security interest in the tractor[1] which was subordinate to the perfected security interest of ITT. Flagship's security interest in the collateral was also properly perfected. However, the security agreement did not require the collateral to be insured, and Flagship was not named as a loss payee under the USF&G policy.
IMC and Cable had a working relationship whereby IMC would advance the premiums for all of Cable's insurance policies and credit them to an open account with Cable. Eventually, Cable went bankrupt and left a debt for premiums to IMC. In the meantime, ITT repossessed the tractor from Cable. Later, the tractor was stolen from the property of ITT. As a consequence, Cable and ITT together filed a claim for benefits under the insurance policy. USF&G honored the claim and issued a check for $10,623 payable to Cable and ITT. USF&G transmitted the check to IMC with instructions to deliver it to the loss payees.
Upon receipt of the check, IMC filed a complaint in circuit court alleging that Cable owed to IMC the monies which IMC had advanced to it for premiums, including the premium for the policy rider covering the stolen tractor. Asserting that it held a lien on the check, IMC refused to deliver the check to ITT or to Cable. ITT counterclaimed for declaratory judgment alleging first priority to the insurance proceeds as a named loss payee under the policy. IMC's response asserted that the counterclaim was moot because the check had recently become void and had now been returned to the insurer. Because Cable's note to Flagship was in default, Flagship was permitted to intervene in order to make a claim against the remainder of the insurance proceeds after satisfaction of Cable's obligation to ITT.
IMC obtained a default judgment against Cable in the amount of $16,818. IMC then moved for a writ of garnishment against USF&G alleging that USF&G owed to Cable the sum of $10,623 and that IMC, now a judgment creditor of Cable, was entitled to that sum. In answer to the writ of garnishment, USF&G admitted its debt to Cable but asserted that it could not pay the proceeds of the check to IMC because ITT had a joint interest in them as a loss payee under the policy.
On these admitted facts, ITT, Flagship and IMC each moved for summary judgment. The court entered summary final judgment in which it initially determined that ITT had the first claim to the insurance monies because of its status as an undisputed loss payee with a security agreement and awarded ITT the $3,225.68 owed to it by Cable. Since the security agreement between ITT and Cable called for the payment of attorneys' fees against Cable, the court also allowed ITT to recover $1,500 *575 attorneys' fees from the insurance proceeds. Next, the court concluded that the insurance monies were proceeds of Flagship's collateral interest thereby making Flagship's claim based upon its security agreement superior to IMC's claim. Thus, Flagship received the balance of the insurance proceeds because its claim against Cable exceeded this amount. The court denied Flagship's claim for attorneys' fees. Finally, the court found that IMC would have had a claim against the insurance proceeds, had there been any left, and directed ITT to reimburse IMC for the $135 premium it had advanced to Cable for the insurance rider covering the stolen tractor.
In this appeal IMC claims a right superior to Flagship's in the insurance proceeds and contests the award of attorneys' fees to ITT. Flagship cross-appeals from the denial of its claim for attorneys' fees.[2]
Flagship's security agreement and financing statement provided that its security interest extended to proceeds of the collateral under the security agreement. Thus, Flagship's recovery was predicated upon the conclusion that the insurance monies paid for the loss of the collateral were proceeds within the meaning of Section 679.306, Florida Statutes (1975). The pertinent part of this statute reads as follows:
(1) "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds". All other proceeds are "non-cash proceeds".
(2) Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
These sections first became effective as part of the Uniform Commercial Code in 1967. Under these sections the identifiable proceeds from the disposition of secured collateral become subject to the security agreement. However, Florida has not passed on the question of whether insurance proceeds resulting from the loss of the collateral fall into this category.
There are only a few courts in the nation which have addressed this issue. The first case on the subject was Universal C.I.T. Credit Corp. v. Prudential Investment Corp., 101 R.I. 287, 222 A.2d 571 (1966). In that case, even though the financing statement provided that the proceeds of the collateral were covered by the security agreement, the court held that insurance monies paid for the loss of the collateral did not constitute proceeds under the identical section of the Uniform Commercial Code. The court said:
"Proceeds" by definition under the code arises from either a sale, exchange, collection or other disposition of either the collateral or proceeds. Insurance moneys or proceeds, however, arise and are paid as the result of a contract. An insurance contract or policy, so called, pertains to the persons to the contract and not to the item insured. It is a personal contract which does not attach to or run with the property insured. Universal C.I.T. Credit Corp., supra, at 574.
The court in Quigley v. Caron, 247 A.2d 94 (Me. 1968), relied substantially on Universal C.I.T. Credit Corp. to reach the same result. The court reasoned that the words "sold, exchanged, collected or otherwise disposed of" implied a voluntary disposal by the owner rather than a change resulting from an involuntary calamity.
On the other hand, several courts have recently reached the opposite result. PPG Industries, Inc. v. Hartford Fire Insurance Company, 531 F.2d 58 (2d Cir.1976); Firemen's Fund American Insurance Company v. Ken-Lori Knits, Inc., 399 F. Supp. 286 (E.D.N.Y. 1975); First Nat. Bank v. Merchant's Mut. Ins. Co., 89 Misc.2d 771, 392 *576 N.Y.S.2d 836 (Sup.Ct. 1977); Northside Properties, Inc. v. Ko-Ko Mart, Inc., 28 N.C. App. 532, 222 S.E.2d 267 (1976), cert. denied 289 N.C. 615, 223 S.E.2d 392 (1976); In Re Hunter, 9 UCC Rptr. 928 (S.D.Ohio 1971).
In PPG, the security agreement called for the owner to obtain insurance on the collateral and to assign the right to receive the proceeds of the insurance to the creditor. Despite the fact that the insurance policy did not contain a loss payee clause, the court construed the subject code section to include insurance within the scope of the term "proceeds." In affirming the trial judge, the court of appeals observed:
The district court below, despite the absence of a similar loss-payee clause, specifically rejected the reasoning of the Quigley and Universal C.I.T. Credit Corp. decisions, and decided that in this case any construction of § 9-306(1) which does not include insurance within the scope of the term "proceeds" would contravene the express intent of the parties. Furthermore, the Court pointed out that in 1972 the Commissioners on Uniform State Laws amended 9-306(1) to provide that "insurance payable by reason of loss or damage to the collateral is proceeds...." As the reporter's commentary to this amendment indicates, the "new ... sentence ... is intended to overrule various cases to the effect that proceeds of insurance on collateral are not proceeds of the collateral." Although this amendment has not yet been adopted in New York, it is a persuasive indication of the effect which § 9-306 was originally intended to have. Since no New York court has ruled on this question, the fact that the state legislature had not yet enacted this amendment does not preclude a federal court from rendering a decision which is consistent with the original intention underlying § 9-306. For this reason, the district court was correct in holding that PPG had a security interest in the proceeds of the insurance policy. PPG Industries, supra, at 61.
Florida, like New York, has not amended Section 9-306(1). This lays the foundation for arguments which cut both ways. Contrary to the rationale of PPG, it could be argued that the proposed amendment constitutes a substantive change which Florida has not seen fit to adopt. Nevertheless, we conclude that the term "proceeds" in Section 679.306(1) contemplates the identifiable insurance monies which are paid upon the loss of the collateral.
When there is a voluntary disposition of collateral, the perfected security interest follows the collateral into the hands of a third party and also covers the proceeds obtained therefrom. Where there has been an involuntary disposition of the collateral by way of theft or destruction, it would be anomalous if the creditor had no claim against the insurance monies paid to the owner for the loss of the collateral. In essence, the insurance proceeds represent the dollar equivalent of the collateral. Since the owner has pledged the collateral as security, why should not this dollar equivalent be subject to the security agreement? See 65 Mich.L.Rev. 1514. Where, as here, the debtor has become insolvent, the creditor would otherwise be totally without recourse. By the same token, a solvent debtor should be in no position to complain because the insurance proceeds will be applied toward the payment of the obligation for which he pledged the collateral in the first place.
It would be unwarranted to limit the words "sold, exchanged, collected or otherwise disposed of" to a voluntary disposition. As stated in In Re Hunter, 9 UCC Rptr. 928, 930 (S.D.Ohio 1971):
To read a question of intent, fault, or voluntariness into the statute for the purpose of defeating a security interest would serve only to rely on concepts or legal fictions that do violence to both ordinary semantics and practices in the market place. If one looks at the intent, then a debtor who deliberately wrecked his car would not defeat the secured party's interest, but one who suffered an accident beyond his control would. In *577 either event, the collateral has been "disposed of."
We are not persuaded that our holding does violence to the rule that ordinarily a mortgagee has no right to the benefits of a policy of insurance effected by the mortgagor on mortgaged premises for his own benefit in the absence of either an assignment of the policy to the mortgagee or an agreement requiring the mortgagor to insure for the benefit of the mortgagee. 55 Am.Jur.2d Mortgages § 276; cf. Atwell v. Western Fire Ins. Co., 120 Fla. 694, 163 So. 27 (1935). Here, the mortgagor has already manifested an intent to secure the proceeds of the collateral, and by our decision we are simply construing the definition of "proceeds" to include insurance monies which are paid by reason of the loss of the collateral. Our conclusion is supported by Section 679.203(1)(b), Florida Statutes (1975), dealing with enforceability of security interests, which states:
In describing collateral, the word "proceeds" is sufficient without further description to cover proceeds of any character. (Emphasis supplied.)
IMC further argues in its brief that even if insurance proceeds were covered by Flagship's security agreement, only the backhoe attachment rather than the entire tractor was within the description of the collateral for Flagship's loan. Thus, IMC suggests that the most Flagship is entitled to recover is that portion of the insurance proceeds equivalent to the insured value of the backhoe attachment. This is a sound position if IMC is correct in its factual premise. Flagship fails to address the point in its brief, and the court below does not seem to have considered the question. While there are some references to this subject in the record, the differences in terminology employed by the parties make it difficult for us to verify the accuracy of IMC's contention. This is a matter which should be explored and determined when the court holds its further hearing on attorneys' fees as hereinafter directed.
For its last point on appeal, IMC argues that ITT should not have been awarded attorneys' fees because ITT made its claim against the insurance proceeds rather than against Cable. This is a technical argument which fails to stand up under scrutiny. The insurance proceeds were payable to ITT and Cable, as their interest may appear. If IMC had delivered the check to the payees rather than bringing this suit, it would have been unnecessary for ITT to employ attorneys to collect Cable's obligation. ITT's security agreement authorized the payment of attorneys' fees in the event an attorney was retained for collection. Since ITT had to use attorneys to establish its priority in the proceeds, it was entitled to a reasonable attorneys' fee out of the same fund. A similar result occurs in a mortgage foreclosure when the first mortgagee's claim for attorneys' fees takes priority over the interests of subsequent mortgagees and of the property owner.
Through the application of the same principles, once it was determined that Flagship had a claim to the insurance proceeds, we believe that Flagship should also have been awarded from these proceeds reasonable attorneys' fees incurred in the collection of Cable's obligation. The attorneys' fee provision of Flagship's security agreement was broader than ITT's in that it specifically provided that the proceeds of any collateral could be applied toward the payment of reasonable attorneys' fees. Thus, the court erred in denying Flagship's claim for attorneys' fees.
The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.
HOBSON, Acting C.J., and SCHEB, J., concur.
NOTES
[1] Flagship's security interest may only have covered the backhoe attachment on the tractor. This subject will be further addressed in the latter part of this opinion but for purposes of deciding the primary point on appeal, it shall be assumed that Flagship had a security interest in the entire tractor.
[2] ITT does not contest the payment of the $135 premium.